UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SCOTT SEDORE,

                            Plaintiff,

v.

SHERMAN CAMPBELL, *et al.*,

                        Defendants.

_____/

Civil Action No. 19-10311

Sean F. Cox
United States District Judge

David R. Grand
United States Magistrate Judge

## REPORT AND RECOMMENDATION ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 78, 97, 98)

*Pro se* plaintiff Scott Sedore ("Sedore"), an incarcerated person, brings this civil rights action pursuant to 42 U.S.C. § 1983, alleging that between August 7, 2017, and May 31, 2018, while he was an inmate at the Gus Harrison Correctional Facility ("ARF") in Adrian, Michigan, the defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. The remaining defendants in this matter include Corizon Health, Inc. and two of its employees, Mary Greiner, D.O. and Rosilyn Jindal, P.A. (collectively the "Corizon Defendants"), as well as James Blessman, M.D., an independent contractor of the Michigan Department of Corrections ("MDOC"). An Order of Reference was entered on June 21, 2022, referring all pretrial matters to the undersigned pursuant to 28 U.S.C. § 636(b). (ECF No. 108).

Before the Court are three dispositive motions: (1) a Motion for Partial Summary Judgment on exhaustion grounds filed by Dr. Blessman on September 17, 2021; (2) a

Motion for Summary Judgment filed by the Corizon Defendants on January 7, 2022; and

(3) a substantive Motion for Summary Judgment filed by Dr. Blessman on January 7, 2022.

(ECF Nos. 78, 97, 98).  Sedore filed separate responses to these motions (ECF Nos. 82,

100, 101, 102), and the defendants filed replies (ECF Nos. 84, 105, 106).

Having reviewed the pleadings and other papers on file, the Court finds that the facts

and legal issues are adequately presented in the parties' briefs and on the record, and it

declines to order a hearing at this time.

## I.   RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that: (1) the Corizon

Defendants' Motion for Summary Judgment **(ECF No. 97)** be **GRANTED**; (2) Dr.

Blessman's Motion for Partial Summary Judgment on exhaustion grounds **(ECF No. 78)**

be **GRANTED IN PART AND DENIED IN PART**; and (3) Dr. Blessman's substantive

Motion for Summary Judgment **(ECF No. 98)** be **DENIED**.

## II.   REPORT

### A.   Procedural History

Sedore filed his complaint in this matter on January 25, 2019, alleging violations of

the Eighth Amendment.[1]  (ECF No. 1).  On December 4, 2019, the Corizon Defendants

---

[1] Sedore's complaint also included claims for First Amendment retaliation and violation of the Americans with Disabilities Act ("ADA").  (ECF No. 1).  On March 29, 2019, however, the then-assigned district judge issued an Opinion and Order of Partial Summary Dismissal dismissing, *inter alia*, Sedore's First Amendment retaliation claim.  (ECF No. 10, PageID.95-96).  In their instant Motion for Summary Judgment, the Corizon Defendants argue that Sedore has failed to state a claim under Title II of the ADA because (1) Sedore has not made clear in what way he was denied an opportunity to participate in or benefit from Corizon's services, programs, or activities; (2) Sedore has failed to establish that Corizon, as a private entity, would be subject to Title II of the ADA; and (3) Sedore has failed to establish that the Corizon Defendants discriminated against

filed a Motion for Partial Summary Judgment for Failure to Exhaust Administrative Remedies.[2] (ECF No. 43). On September 21, 2020, the then-assigned magistrate judge recommended that the Corizon Defendants' motion be granted in part and denied in part. (ECF No. 56). On February 5, 2021, this recommendation was adopted. (ECF No. 67). Thus, all that remains are Sedore's claims that the defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment.

### B. Factual Background[3]

By way of background, in October 2009, Sedore caused a high-speed, head-on car accident while he was intoxicated. One person was killed and another was seriously injured. Sedore, who was also injured in the accident, is still serving a custodial sentence for his criminal conduct. At issue in this case are Sedore's allegations that defendants failed to treat the "debilitating pain" he experienced throughout his body during the custodial period in question – summer of 2017 to mid-2018. (ECF No. 1, PageID.17-18).

On August 7, 2017, Sedore was transferred from Alger Correctional Facility ("LMF") to ARF. The transfer documentation notes that Sedore's diagnoses included

---

him because of a disability. (ECF No. 97, PageID.1471-73). In his response to the Corizon Defendants' motion, Sedore does not present any argument or evidence to the contrary. (ECF No. 100). Because Sedore does not oppose this aspect of the Corizon Defendants' motion, **IT IS RECOMMENDED** that his ADA claims be **DISMISSED**.

[2] On December 4, 2019, Dr. Blessman also filed a Motion to Dismiss. (ECF No. 44). On September 24, 2020, it was recommended that this motion be denied. (ECF No. 57). This recommendation was adopted on June 8, 2021. (ECF No. 72).

[3] Unless otherwise indicated, the facts set forth herein are taken from Sedore's MDOC medical records, which were provided to the Court as Exhibit A to the Corizon Defendants' Motion for Summary Judgment. (ECF No. 97-1). The Court will primarily focus on medical records from the time period at issue, i.e., August 7, 2017, to May 31, 2018.

osteoarthrosis, compulsive personality disorder, antisocial personality disorder, unspecified drug dependence, hyperlipidemia, pain in his joints, prediabetes, and chronic airway obstruction. (ECF No. 97-1, PageID.1496). Sedore's active orders were for, *inter alia*, permanent wheelchair detail, two extra pillows, a reacher, a cane, two extra cotton blankets, a shower chair, prescription shoes with a lift, a CPAP machine, a dental biteguard, bottom bunk duty, and approval for elevator use. (*Id.*, PageID.1497-99). Sedore was evaluated by Sarah Tindall, R.N. upon transfer to ARF, at which time he denied active symptoms and did not appear to be in any current distress. (*Id.*, PageID.1500-01).

On August 9, 2017, PA Jindal performed a chart review. (*Id.*, PageID.1502-03). At that time, Sedore's active medications were Resource drinks, Zocor, ibuprofen, artificial tears, Milk of Magnesia, Tylenol, Dulcolax, and a Proair inhaler. (*Id.*). PA Jindal ended Sedore's Ultram prescription, which began two days earlier for the sole purpose of helping him during facility transfer. (ECF No. 97-3, PageID.1721).

On August 10, 2017, Sedore underwent a neuropsychological evaluation with Christian Schutte, Ph.D. to assess his cognitive functioning and capacity to tolerate surgical intervention to his spine.[4] (ECF No. 97-1, PageID.1504-10). Sedore underwent a psychodiagnostic interview and objective cognitive testing, which required three hours of face-to-face administration and extensive analysis of his medical history and medical records. Dr. Schutte observed that Sedore's performance on tasks typically most affected by the sequelae of traumatic brain injury were both at expectation and in the average range,

---

[4] Previously, Sedore had been seen by a neurosurgeon, Amritraj Loganathan, M.D., who recommended a neuropsychology consult prior to any surgery. (ECF No. 25, PageID.248).

and there was no suggestion that he lacked the capacity or ability to manage treatment.  On August 15, 2017, PA Jindal reviewed these records, noting Dr. Schutte's findings.  (*Id.*, PageID.1511; ECF No. 97-3, PageID.1721).

On August 24, 2017, Sedore submitted a healthcare request ("kite") for a neurosurgical consult.  (ECF No. 97-1, PageID.1514).  Mary Velarde, R.N. responded that the consultation should be discussed at his next medical appointment, which was scheduled in September.  On September 6, 2017, Sedore kited, requesting an appointment with an orthopedic surgeon.  (*Id.*, PageID.1515).  Sarah Wielfaert, R.N. advised Sedore to raise this issue with his medical provider at his upcoming appointment.  On September 9, 2017, Sedore kited again, indicating that he had seen a neurologist and undergone EMG testing in January 2017 and inquiring whether further testing would be done.  (*Id.*, PageID.1516).  Sedore was seen on September 13, 2017, in response to this kite, at which time he was informed that he would have a provider appointment within the next two weeks and that his questions should be asked at that time.  (*Id.*, PageID.1517-18).

On September 18, 2017, Sedore saw PA Jindal for a chronic care visit.  (*Id.*, PageID.1519-22).  PA Jindal noted that Sedore's hyperthyroidism had resolved, with the only symptoms being muscle weakness and weight loss, but his hyperlipidemia was unresolved.  PA Jindal further noted that Sedore's compliance with diet and exercise was poor, but his medication and follow-up compliance was good.  Sedore complained of back pain, bone and joint symptoms, muscle weakness, and myalgia.  With respect to Sedore's claim of abnormal weight loss, PA Jindal submitted a request to the Assistant Chief Medical Officer ("ACMO") for approval of Ensure and ordered weekly weight checks and

a dietary referral.[5]  Regarding Sedore's complaints of back pain, PA Jindal submitted a

consultation request ("407") for a neurosurgery consult.[6]  Rickey Coleman, D.O. deferred

the request for Ensure on September 18, 2017, because Sedore had gained eighteen pounds

in three months.  (*Id.*, PageID.1526).  On September 19, 2017, Keith Papendick, M.D.

approved the 407 request for a neurosurgery consult.  (*Id.*, PageID.1527-28).

On September 27, 2017, Sedore kited requesting Ensure, three times a day.  RN

Velarde responded by stating his request had been deferred by the ACMO.  (*Id.*,

PageID.1529).  Three days later, Sedore kited again, expressing concern that he would lose

weight, and that it could cause a "catastrophic health issue."  (*Id.*, PageID.1530).  Sedore

further indicated that he was no longer taking Tylenol or ibuprofen because they did not

alleviate his pain.  RN Velarde responded, encouraging Sedore to eat his meals and

advising him that it was up to him to participate in his care so that he could be in the best

physical condition possible in case more intensive intervention was pursued in the

management of his neurological condition.  (*Id.*).

On October 6, 2017, Sedore sent a kite complaining of pain while sleeping.  He said

that he could not lie on either hip for very long; complained that he could not straighten his

legs; and indicated that he could not sleep for long due to pain.  RN Velarde responded,

saying that his condition was being monitored, he was scheduled for a neurosurgical

---

[5] Previously, Sedore was receiving high calorie/protein drinks because he had lost approximately 70 pounds between January and August 2017.  (ECF No. 25, PageID.312-14).

[6] This 407 request cites Sedore's history of lower back pain stemming from the motor vehicle accident in 2009.  (ECF No. 97-1, PageID.1524-25).  Sedore's complaints of pain radiating to both hips were noted, as well as his diagnosis of nerve length dependent sensory motor axonal peripheral neuropathy.

follow-up, and there would be a provider follow-up in January after the neurosurgical consultation. (*Id.*).

On October 10, 2017, Sedore kited with complaints that, "for years," high doses of Tylenol and NSAIDs were being "forced" onto him without any type of blood testing to monitor for liver disease. (*Id.*, PageID.1532). RN Velarde responded, stating that Sedore's liver enzymes and kidney function had been regularly monitored for years, and that his kite would be forwarded to the pharmacy.

Also on October 10, 2017, Sedore underwent a nutritional therapy reassessment. (*Id.*, PageID.1533-34). It was noted that he had been receiving high calorie/protein snacks since May 2017 due to significant weight loss. While Sedore was receiving the snacks, his weight fluctuated. Thus, it was recommended that his high calorie/protein snacks be discontinued and weekly weight checks be performed to see if he required further nutritional supplements.

On October 17, 2017, Sedore kited, requesting tramadol for "urgent pain" that was causing difficulty with his activities of daily living and sleep. (*Id.*, PageID.1536). A nursing callout was scheduled. On October 19, 2017, PA Jindal reviewed Sedore's medical record and noted that he was refusing ibuprofen and Tylenol, and that medication would be discussed at a medical provider appointment. (*Id.*, PageID.1537). Later that same day, Sedore presented for a nursing visit in response to his kite. (*Id.*, PageID.1538-39). Amy Sobieralski, R.N. noted that Sedore was noncompliant with his Tylenol and Motrin and was refusing to wear his CPAP at night. RN Sobieralski educated Sedore on the importance of taking ordered medications and wearing the CPAP machine, which could decrease

7

inflammation and pain.  Sedore expressed understanding but requested new medication orders.  An appointment with his provider was scheduled.

On October 25, 2017, Sedore presented to Mary Greiner, D.O.  (*Id.*, PageID.1540-41).  He complained of constant, throbbing leg pain that radiated to his lower back, rating the pain at 8/10.  Sedore also described constant, stabbing right hip pain, rating it at 8/10, and indicating that it rendered him unable to sleep at night.  Sedore told Dr. Greiner that he had tried Neurontin and Cymbalta without improvement.  He reported that prior to his motor vehicle accident, he was taking Norco, fentanyl, Ultram and Dilaudid for chronic lower back pain.  Dr. Greiner noted that Sedore turned in his Motrin and Tylenol, and he refused Neurontin, because none of these medications were helping his pain.  Dr. Greiner also noted that Sedore's case had been reviewed by the Pain Management Committee ("PMC") on May 9 and June 20, 2017, and most recently the committee had determined that there was no need for non-formulary medicine.  Dr. Greiner further noted that Sedore had appointments with orthopedics and neurosurgery in the coming week, and she indicated that she would defer to the PMC and the specialists for guidance on pain management.  (*Id.*; ECF No. 97-2, PageID.1717-18).

On October 26, 2017, Sedore had an orthopedic consult with Timothy Ekpo, D.O. related to his hip pain.  (ECF No. 97-1, PageID.1542-45).  Dr. Ekpo noted that Sedore had a total right hip replacement in 2013, and that the leg continued to hurt for a year following the surgery due to a leg length discrepancy.  During this visit, Sedore had a right hip x-ray taken which showed total right hip hardware was in a good position, but there was a bone fragment lateral to the cup.  The left hip x-ray showed mild loss of joint space but retained

8

pin and screws.  Dr. Ekpo recommended a Psoas release procedure but indicated that his office did not perform it.  Dr. Ekpo further noted that Sedore would need to obtain approval from the MDOC to move forward with this procedure.  (*Id.*).

On October 28, 2017, Sedore sent a kite, stating that he had wanted to ask for several accommodations during his October 25, 2017, visit with Dr. Greiner, but she allegedly refused to let him speak.  (*Id.*, PageID.1546).  RN Wielfaert notified Sedore that his kite had been forwarded to the nurse manager.  On October 29, 2017, Sedore kited again, requesting an extra mattress due to pain.  (*Id.*, PageID.1547).  RN Velarde responded, stating that the provider made the determination of whether requests for additional accommodations were sent to the ACMO, and Sedore had not demonstrated a medical need.  RN Velarde further told Sedore that when he documented his every complaint in a kite, it made it difficult to read each individual kite and determine what he was requesting.

On October 30, 2017, Sedore kited again, this time asking whether the Psoas release procedure had been scheduled following Dr. Ekpo's evaluation and whether he was going to see a neurosurgeon.  (*Id.*, PageID.1548).  Tammra Rothharr, R.N. informed him that the provider had to wait for the dictation from his appointment with Dr. Ekpo and that he was scheduled to see the neurosurgeon.  The same day, Sedore sent a second kite relaying complaints about his visit with Dr. Greiner and requesting a raised toilet seat, a new shower chair, a urinal, and pain medication.  (*Id.*, PageID.1549).  RN Rothharr responded by stating that after checking with the unit, the shower chair was in good shape, there was no medical need for a urinal, and his case had been sent to the PMC earlier in the year and they did not approve additional pain medication.

9

On October 30, 2017, Sedore underwent a neurosurgery consult with Amritraj Loganathan, M.D. (*Id.*, PageID.1550-53). He complained of back pain, leg pain, and hip pain. Dr. Loganathan noted that Sedore had tried physical therapy in the past without any discernable improvement, but he had not yet tried epidural steroid injections. Dr. Loganathan noted that Sedore's EMG suggested polyneuropathy, so he recommended he see a neurologist. Lumbar fusion surgery was discussed, but given Sedore's possible upcoming hip surgery, conservative treatment was recommended, including at least one epidural steroid injection. On October 31, 2017, PA Jindal placed a 407 request for a neurosurgery consultation for Sedore to receive an epidural steroid injection, pursuant to Dr. Loganathan's recommendation. (*Id.*, PageID.1554-55; ECF No. 97-3, PageID.1722). That request was approved on November 2, 2017. (ECF No. 97-1, PageID.1559-60).

On November 1, 2017, Sedore kited again, complaining of frequent urination at night and requesting "a number of additional special considerations." (*Id.*, PageID.1556). RN Velarde informed him that the nursing manager responded to his requests and that none would be given without ACMO approval.

On November 2, 2017, Samantha Tipton submitted a 407 request for the Psoas release procedure recommended by Dr. Ekpo. (*Id.*, PageID.1557-58). On November 6, 2017, Dr. Papendick reviewed this request, indicating that medical necessity had not been demonstrated at the time and recommending a consult with an orthopedic surgeon willing to perform the procedure. (*Id.*, PageID.1566-67).

On November 3, 2017, Sedore was evaluated by Kathryn Everhart, R.N. regarding his request for a urinal. (*Id.*, PageID.1563-64). Sedore stated that his incontinence

garments had been taken away in 2016, and that he was the only person in his unit without a urinal.  RN Everhart ordered a chart review.  Later that day, Sedore again kited healthcare, claiming that the treatment he received from the defendants and the PMC was "tantamount to torture."  (*Id.*, PageID.1565).  RN Velarde informed Sedore that the standard of care provided to him was the same one applied to all prisoners.  She instructed him to state exactly what it was that he thought would remedy his symptoms so that a dialogue could be opened about what was and was not possible while he was incarcerated.

On November 7, 2017, Sedore kited requesting Ultram.  (*Id.*, PageID.1568).  RN Verlarde reminded him of the various medications he previously had taken and/or requested (including Neurontin, Ultram oxycodone, fentanyl, Norco, and Dilaudid), indicating that healthcare was aware he "wanted [narcotics] and possibly surgery" and there was no need to send lengthy kites.  (*Id.*, PageID.1569-70).

On November 13, 2017, PA Jindal met with Sedore to discuss an alternative treatment plan for the Psoas release procedure.  (*Id.*, PageID.1571-73).  The plan was to resubmit a 407 request for an orthopedic consult for the procedure and continue prescribed medications; Sedore was advised to kite with any health concerns.  PA Jindal submitted a new 407 request the same day.  (*Id.*, PageID.1574-75).  It was approved by Dr. Papendick on November 15, 2017.  (*Id.*, PageID.1578-79).

On November 16, 2017, Sedore presented to Dr. Greiner to discuss his accommodation needs.  (*Id.*, PageID.1580-81).  Sedore again requested a private, portable, elevated toilet seat.  Dr. Greiner noted Sedore's upcoming orthopedic and neurosurgery consults, as well the special accommodations he was receiving, including an aide for room

duties, extra cotton blankets, and extra pillows. Dr. Greiner observed Sedore rise out of his wheelchair to use the scale, leave the wheelchair in the hall, ambulate to the chair in her office, and rise out of the chair using his cane without struggle. Dr. Greiner spoke with the nursing supervisor and staff from Sedore's housing unit. Based on her observations, evaluation, and discussions with nursing and custody staff, Dr. Greiner determined that Sedore should continue to use the handicap toilet provided in his handicap wing; the detail for extra cotton blankets would be removed, as there was no justification for them in the note where they were provided; and his detail for a room aide would be discontinued, as it was not a service for which medical details were given. (*Id.*, ECF No. 97-2, PageID.1718). This was the last direct involvement that Dr. Greiner had with Sedore's medical care. (*Id.*).

On November 19, 2017, Sedore sent a three-page kite stating that his medical needs, special accommodation needs, and pain management needs were going unmet by PA Jindal and Dr. Greiner. (ECF No. 97-1, PageID.1584). RN Wielfaert forwarded this letter to the health utilization manager. On November 21, 2017, Sedore sent a kite complaining that his pain impaired his activities of daily living. (*Id.*, PageID.1585). He requested pain medication and stated that it was hard to sit up to change the channel on his television or put on shoes and socks. He was scheduled for a callout to assess his mobility and aptitude for performing activities of daily living.

On November 22, 2017, Sedore kited requesting that Dr. Greiner or PA Jindal place a 407 request for him to see a neurologist per the neurosurgeon's recommendation. (*Id.*, PageID.1586). RN Velarde responded by stating that recommendations from specialists were used to advise the development of plans of care, and that recommendations were not

orders.  Sedore was advised that his care was being managed by the providers according to the protocol used statewide for the development of treatment plans.

On November 23, 2017, Sedore was evaluated for right hip and back pain.  (*Id.*, PageID.1587-90).  Laura Caddarette, R.N. noted that Sedore had been seen by Dr. Greiner the week prior and was told to try to ambulate more with a cane to strengthen his legs. Sedore stated that he wanted documentation regarding his kiting with complaints of pain and his need for pain management and neurology consults.  RN Caddarette encouraged him to have patience, as he had been approved for a possible Psoas release procedure and epidural steroid injection.

On November 26, 2017, Sedore kited complaining that he could not put on his shoes, socks, or pants without help.  (*Id.*, PageID.1591).  Sedore also complained that he was going to lose a "lot of weight" because he wouldn't be able to go eat.  The kite was forwarded to the nursing supervisor.

On November 28, 2017, Sedore was evaluated by Diane Strawser, R.N. during a nursing visit to check his blood pressure and weight.  (*Id.*, PageID.1592-93).  Sedore stated that his pain levels were 0/10.  On November 27, 2017, Sedore sent a kite requesting a special accommodation for a room aide.  (*Id.*, PageID.1594).  RN Rothhaar responded on November 29, 2017, stating that the provider reviewed his special accommodations and found that it was not medically necessary for him to have an aide.  On December 7, 2017, Sedore kited stating that his pain was affecting his ability to take care of his daily needs. (*Id.*, PageID.1595).  RN Velarde scheduled Sedore for a callout to assess the impact that pain had on his activities of daily living.

13

On December 8, 2017, Sedore was evaluated for complaints of back, leg, and hip pain. (*Id.*, PageID.1596-1600). RN Tindall educated Sedore on non-pharmacological interventions, such as breathing techniques, guided imagery, and occupying time. She noted no visual abnormalities or swelling in the lower extremities. Sedore denied grinding or clicking of the right hip. RN Tindall further noted that Sedore was calm and cooperative throughout the evaluation, and that he felt better after speaking with her. Sedore returned to his housing unit in stable condition.

On December 20, 2017, Sedore returned from an offsite appointment for his epidural steroid injection. (*Id.*, PageID.1601-02). RN Everhart noted that the injection site on Sedore's lower back was not bruised or discolored. Sedore stated that he did not feel different but was told it could take a few days to notice improvement. He was released to housing in stable condition.

On December 21, 2017, PA Jindal documented that Sedore received the epidural steroid injection. (*Id.*, PageID.1603). PA Jindal noted that the purpose of the injection was to help treat Sedore's history of lumbar stenosis with radiculopathy. PA Jindal reviewed Sedore's medical records and recommended that he return to healthcare as needed. On January 3, 2018, PA Jindal again reviewed Sedore's chart and renewed his medications. (*Id.*, PageID.1604-05; ECF No. 97-3, PageID.1723).

On January 4, 2018, Sedore sent a kite complaining that he had pain that was affecting his sleep, and that the epidural steroid injection had not helped. (ECF No. 97-1, PageID.1606). He was evaluated the next day by RN Sobieralski. (*Id.*, PageID.1607-09). Sedore complained of pain "all over from the back down to [his] feet," saying that Tylenol

14

and Motrin did not work.  RN Sobieralski noted that Sedore had an upcoming chronic care appointment with PA Jindal.  She encouraged him to be thorough in discussing his pain at that appointment.  Non-pharmacological methods of pain relief were discussed, and Sedore agreed to try an ice detail in the evenings for inflammation and pain.

On January 8, 2018, Sedore submitted a kite complaining of chronic pain.  (*Id.*, PageID.1613).  Kimberly Korte, R.N. informed Sedore that he had been approved for his Psoas release procedure, but they were waiting for it to be scheduled.

On January 22, 2018, Sedore presented for a chronic care visit.  (*Id.*, PageID.1614-17).  PA Jindal noted Sedore as reporting pain that was aching and throbbing and aggravated by bending, climbing stairs, movement, walking, and standing.  Sedore stated that his pain was relieved by prescription medications.  PA Jindal noted that the plan was to continue Motrin and Tylenol as needed, await the consultation for the Psoas release procedure, and consider referral to the PMC.

On January 24, 2018, PA Jindal submitted a 407 request for a PMC re-evaluation. (*Id.*, PageID.1618-19).  PA Jindal noted that Sedore was having difficulty sleeping at night due to his pain, had signs of a Psoas impingement, was scheduled for a Psoas release procedure, had been diagnosed with nerve length dependent sensory motor axonal peripheral polyneuropathy, and that the recent epidural steroid injection had not provided relief.  PA Jindal further noted that neurosurgery recommended possible lumbar fusion surgery, but the Psoas release procedure would be performed first.

On January 31, 2018, Dr. Blessman documented the PMC's determination that Sedore should be prescribed 30 mg of Cymbalta per day, titrated up to 60 mg after a week.

(*Id.*, PageID.1620).   Sedore would need to have a detailed evaluation if another PMC referral was to be made.   PA Jindal conducted a chart review the following day, noting the PMC's recommendations.  (*Id.*, PageID.1621-22; ECF No. 97-3, PageID.1723).

On February 9, 2018, Sedore kited complaining of an "inhaler limit."  (ECF No. 97-1, PageID.1623).   He claimed "every minute of every day" would be a problem without an inhaler, saying that he had received one inhaler every month since December 2016.   RN Velarde responded, stating that if Sedore experienced respiratory difficulty, he should have the unit officer contact healthcare so he could be evaluated.   She further explained that this would give Sedore the opportunity to demonstrate his more frequent need for an inhaler, since a full respiratory assessment would be performed in conjunction with the treatment.

On February 13, 2018, Sedore presented for a scheduled provider visit to discuss the PMC's recommendations.  (*Id.*, PageID.1624-28).   At that time, Sedore was evaluated for respiratory issues: he was negative for cough and wheezing, and his lungs were clear to auscultation and percussion.   Sedore refused the PMC's recommendation for Cymbalta, stating that it had not relieved his symptoms in the past.   Thus, PA Jindal recommended he continue with his current medications and kite for any other health concerns.

On March 12, 2018, Sedore kited, again requesting an inhaler as it was previously prescribed at another facility.  (*Id.*, PageID.1629).   Janet Campbell, R.N. responded to the kite, stating that Sedore would receive inhalers as the provider prescribed them, and that the doctor and physician's assistant would prescribe medication to meet his needs.   RN Campbell noted that if Sedore needed emergency care, he should tell an officer or come to healthcare for further evaluation.

On March 14, 2018, Sedore was evaluated by Deborah Ellenwood, R.N. in response to his complaints about his inhaler. (*Id.*, PageID.1630-32). Sedore stated that he had scarring in his lungs because of his previous car accident, which made it hard to breathe, but that albuterol inhalers helped. Sedore claimed that without one inhaler per month, he could not catch his breath when he laid down. During the evaluation, Sedore stated that he did not use his CPAP machine because he could not sleep at night. RN Ellenwood noted that Sedore's lungs were clear to auscultation; did not have rales, crackles, or wheezes; and that lung function was not diminished.

On April 3, 2018, Sedore was evaluated by Michelle Davis, N.P. at Michigan Medicine. (*Id.*, PageID.1633-36). Sedore's complaints were discussed in detail, including both his orthopedic consult with Dr. Ekpo and his neurosurgery consult with Dr. Loganathan. An examination of Sedore's left hip revealed no pain with internal or external rotation. Examination of Sedore's right hip revealed mild pain on internal or external rotation and significant pain with palpitation along the Psoas tendon. Sedore had 5/5 knee flexion and extension and ankle plantarflexion and dorsiflexion. His x-rays showed total right hip arthroplasty with no hardware complications. There were small heterotopic ossifications found about the right hip. NP Davis determined that a procedure directed at the Psoas tendon was not recommended, nor was it performed at their office. A revision to the total right hip arthroplasty also was not recommended as his implants did not show gross loosening or malpositioning. Sedore was advised that his pain could be stemming from tight muscles around his hip joint. NP Davis determined that infection should be ruled out and if negative, he should be referred to a physical medicine and rehabilitation

17

("PMR") physician for consideration of an injection to rule out sources of pain. An aggressive stretching program at the hip or physical therapy was recommended, and a referral to a PMR physician was provided.

PA Jindal submitted a 407 request on April 4, 2018, for Sedore to have a diagnostic hip injection into his Psoas muscle by a PMR physician. (*Id.*, PageID.1601; ECF No. 97-3, PageID.1724). Dr. Papendick approved the request on April 6, 2018, but questioned whether a consultation with a PMR physician had first been completed. (ECF No. 97-1, PageID.1639-40). PA Jindal revised her request, and Dr. Papendick approved it on April 11, 2018. (*Id.*, PageID.1641-44; ECF No. 97-3, PageID.1724).

On April 18, 2018, Sedore presented for a provider visit requesting an accommodation for incontinence garments due to urinary leakage, primarily at night. (ECF No. 97-1, PageID.1645-50). He did not raise any other complaints. PA Jindal updated Sedore's special accommodations to include incontinence garments and requested ACMO approval for a "reacher" to assist with activities of daily living such as putting on socks and shoes. Dr. Coleman reviewed and approved the request for a reacher the same day. PA Jindal also ordered an attendant to assist Sedore with movement inside the institution. (*Id.*, PageID.1645-54; ECF No. 97-3. PageID.1724-25).

Sedore was evaluated by James Richardson, M.D., a PMR physician on June 5, 2018. (ECF No. 22, PageID.188-89). Based on Dr. Richardson's evaluation, he believed that Sedore's hip joint was unlikely to be the source of his pain. Dr. Richardson documented that Sedore was focused on the hip joint and worried that his hip would need to be replaced. Dr. Richardson emphasized that this was not the case. Dr. Richardson

concluded that scarring of the hip component was likely irritating one of Sedore's hip flexors, so ice was recommended, along with an ultrasound-guided injection. Around the same time, Sedore was transferred out of ARF. (*Id.*, PageID.1654-57).

### C.    Standards of Review

Pursuant to Federal Rule of Civil Procedure 56, the Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011). A fact is material if it might affect the outcome of the case under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the Court assumes the truth of the non-moving party's evidence and construes all reasonable inferences in the light most favorable to the non-moving party. *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In response to a summary judgment motion, the opposing party may not rest on its pleadings, nor "'rely on the hope that the trier of fact

will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander*, 576 F.3d at 558 (internal quotations omitted).

### D.     Analysis

At this juncture, several counts pled in Sedore's complaint have been dismissed. (ECF Nos. 56, 67).  What remains are Sedore's Eighth Amendment claims against the Corizon Defendants (Corizon, PA Jindal, and Dr. Greiner) and Dr. Blessman.  Specifically, Sedore alleges as follows, in relevant part:[7]

- Count 2 – PA Jindal and Dr. Greiner delayed taking him to an orthopedic surgeon, and he suffered chronic pain as a result.

- Count 3 – PA Jindal and Dr. Greiner delayed sending him to a neurosurgeon.

- Count 4 – Diagnostic testing, surgery, and treatments recommended by specialists were not provided by Corizon, Dr. Greiner, and PA Jindal.  Dr. Greiner and PA Jindal acted outside the scope of their training by delaying or refusing to follow specialists' recommendations.

- Count 8 – On October 25, 2017, Sedore had an appointment with Dr. Greiner. She was unprofessional and refused to seek referrals for medical testing, surgery, or pain management and refused to assess his severe pain and need for assistive devices, putting Sedore at risk of injury.

- Count 9 – On November 13, 2017, Sedore had an appointment with PA Jindal.  He attempted to discuss his need for assistive devices and accommodations and asked her to re-submit paperwork to the PMC.  PA Jindal told Sedore to discuss those issues at an upcoming appointment with Dr. Greiner.

- Count 10 – At a November 16, 2017, appointment, Dr. Greiner refused to address Sedore's chronic pain and need for assistive living devices; she also

---

[7] In addition to the fact that several counts previously have been dismissed, Sedore agreed in his response to the Corizon Defendants' Motion for Summary Judgment to voluntarily dismiss Count 1 of his complaint (relating to the denial of high protein drinks).  (ECF No. 100, PageID.1767).

canceled accommodations for a room aide and extra cotton blankets.

- Count 15 – On January 22, 2018, Sedore asked PA Jindal why there was a delay in receiving the hip surgery that had been recommended and discussed with her his chronic pain. PA Jindal refused to address these issues.

- Count 16 – PA Jindal changed Sedore's inhaler prescription so that he could get a refill only once every three months (not every month) in order to save money for Corizon. As a result, Sedore was forced to go two months without an inhaler and experienced breathing problems.

- Count 17 – On February 13, 2018, PA Jindal informed him of the PMC's recommendation to put him on Cymbalta to treat his pain. Sedore alleges that he refused to take Cymbalta because the first time he was on that medication, he lost 85 pounds in less than six months. Sedore claims that both PA Jindal and the PMC were aware of this side effect but gave him no other choice of pain medication.[8]

- Count 18 – Sedore could not use his CPAP machine because he tossed and turned all night due to the pain in his back, hips, legs, and knees. Sedore seems to contend that the Corizon Defendants should have provided him with some sort of different treatment.

Each of these claims is addressed below.

### 1.    The Applicable Legal Standards

As to each of his Eighth Amendment claims, Sedore must prove that the defendant in question was deliberately indifferent to his serious medical needs. To succeed on such a claim, Sedore must satisfy two elements: one objective, and one subjective. Specifically, he must show that he had a serious medical need (the objective prong) and that the defendant, being aware of that need, acted with deliberate indifference to it (the subjective prong). *See Jones v. Muskegon Cty.*, 625 F.3d 935, 941 (6th Cir. 2010).

With respect to the objective prong, a serious medical need must be more than "mere

---

[8] The substance of this claim is actually made against Dr. Blessman. *See infra* at 33.

discomfort or inconvenience." *Talal v. White*, 403 F.3d 423, 426 (6th Cir. 2005) (internal quotations omitted). Rather, "[t]he objective component requires the existence of a sufficiently serious medical need." *Broyles v. Corr. Med. Servs., Inc.*, 478 F. App'x 971, 975 (6th Cir. 2012). A serious medical need is one that "has been diagnosed by a physician as mandating treatment *or* one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 897 (6th Cir. 2004) (emphasis in original). An injury is sufficiently serious to satisfy the objective component if a reasonable doctor or patient would find it "important and worthy of comment or treatment"; if it "significantly affects an individual's daily activities"; or if its existence causes "chronic and substantial pain." *Sarah v. Thompson*, 109 F. App'x 770, 771 (6th Cir. 2004) (internal citations omitted).

To satisfy the subjective prong, the plaintiff must show that the defendant possessed "a 'sufficiently culpable state of mind,' rising above negligence or even gross negligence and being 'tantamount to intent to punish.'" *Broyles*, 478 F. App'x at 975 (quoting *Horn v. Madison Cty. Fiscal Ct.*, 22 F.3d 653, 660 (6th Cir. 1994)). Put another way, "[a] prison official acts with deliberate indifference if he knows of a substantial risk to an inmate's health, yet recklessly disregards the risk by failing to take reasonable measures to abate it. Mere negligence will not suffice. Consequently, allegations of medical malpractice or negligent diagnosis and treatment generally fail to state an Eighth Amendment claim of cruel and unusual punishment." *Broyles*, 478 F. App'x at 975 (internal citations and quotations omitted).

Moreover, a plaintiff must demonstrate that a prison official knew of and

disregarded an excessive risk to inmate health or safety by showing that (1) the official was aware of facts from which an inference could be drawn that a substantial risk of serious harm existed, and (2) the official actually drew the inference. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The requirement that the official subjectively perceived a risk of harm and then disregarded it is "meant to prevent the constitutionalization of medical malpractice claims; thus, a plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001). As the Sixth Circuit further explained in *Comstock*:

> When a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation. On the other hand, a plaintiff need not show that the official acted "for the very purpose of causing harm or with knowledge that harm will result." Instead, "deliberate indifference to a substantial risk of serious harm to a prison is the equivalent of recklessly disregarding that risk."

*Id.* (internal citations omitted).

The law is clear, however, that mere differences of opinion or disagreements between a prisoner and prison medical staff over the kinds of treatment a prisoner needs do not rise to the level of deliberate indifference. *See Umbarger v. Corr. Med. Servs.*, 93 F. App'x 734, 736 (6th Cir. 2004). Courts distinguish between "cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011) (internal quotations omitted). "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally

reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976).

2.    *Sedore's Remaining Claims Against the Individual Defendants*

a.    *Count 2*

In Count 2 of his complaint, Sedore alleges that, beginning on or around September 6, 2017, PA Jindal and Dr. Greiner delayed taking him to an orthopedic surgeon, and he suffered chronic pain as a result. (ECF No. 1, PageID.44). This claim is without merit, as the unrebutted record evidence establishes that these individuals were not involved in requesting or scheduling Sedore's orthopedic surgery consult, and thus did not delay it.

Prior to his transfer to ARF in August 2017, Sedore was approved for an orthopedic consult. On September 6, 2017, when Sedore kited, asking about an orthopedic surgery appointment, he was advised by a nurse to raise this issue at his upcoming medical provider appointment.[9] (ECF No. 97-1, PageID.1515). At that appointment, which was with PA Jindal on September 18, 2017, there is no indication that Sedore did so. (*Id.*, PageID.1519-22). Rather, he complained of back pain, bone and joint symptoms, and muscle weakness. As a result, PA Jindal submitted a 407 request for a neurosurgery consult on the same day, which was quickly approved. (*Id.*, PageID.1527-28). Any misdiagnosis by PA Jindal of the type of surgery consult Sedore needed is at most medical negligence, not deliberate indifference. *See Comstock*, 273 F.3d at 703.

---

[9] The Court notes that, on October 26, 2017, Sedore was sent to Dr. Ekpo for an orthopedic consult regarding his hip pain. (ECF No. 97-1, PagID.1542-45). Thus, any delay between when Sedore kited about this issue (on September 6, 2017) and when the consult occurred is relatively minimal, and Sedore has pointed to no evidence that he suffered any additional injury in the interim.

Both PA Jindal and Dr. Greiner submitted affidavits clearly stating that, as Corizon medical providers, they are "not involved in the scheduling or rescheduling of off-site appointments" and that "[a]s it relates to off-site appointments, [their] job function is only to place consultation requests …."  (ECF No. 97-2, PageID.1718-19; ECF No. 97-3, PageID.1726).  Those averments are supported by the aforementioned medical records. Sedore, on the other hand, has not provided any evidence that either PA Jindal or Dr. Greiner were involved in the decision-making process related to his orthopedic surgery consult, or in scheduling him for this off-site visit.  Consequently, PA Jindal and Dr. Greiner are entitled to summary judgment on this claim.  *See Rhinehart v. Scutt*, No. 11-11254, 2014 WL 5361936, at *28 (E.D. Mich. June 20, 2014) (where plaintiff offered no evidence that defendants were personally involved in decisions at issue, summary judgment was appropriate) (citing cases).

### b.    Count 3

In Count 3 of his complaint, Sedore alleges that, on or around September 8, 2017, PA Jindal and Dr. Greiner delayed sending him to a neurosurgeon.  As with Count 2, however, these defendants have established their entitlement to summary judgment on this claim.  Again, Dr. Greiner and PA Jindal provided uncontradicted, sworn testimony that they are not involved in scheduling or rescheduling off-site appointments and have no control over when an inmate is able to see a specialist.  (ECF No. 97-2, PageID.1718-19; ECF No. 97-3, PageID.1726).  The unrebutted record evidence supports these averments.

Following Sedore's transfer to ARF, on September 9, 2017, PA Jindal performed a chart review, noting Sedore's diagnoses of osteoarthrosis and joint pain.  (ECF No. 97-1,

PageID.1502).  PA Jindal then evaluated Sedore on September 18, 2017, determined that he needed a neurosurgery consult, and placed a 407 request for that consult the same day. (*Id.*, PageID.1524-25).  Dr. Papendick approved this request on September 19, 2017, and Sedore's neurosurgery consult occurred on October 30, 2017.  (*Id.*, PageID.1527-28, 1550-53).  Thus, where Sedore has come forward with no evidence to the contrary, Count 3 fails. *See Rhinehart*, 2014 WL 5361936, at *28.  Moreover, Sedore has pointed to nothing in the record from which the Court can conclude that PA Jindal engaged in anything more than unactionable (under the Eighth Amendment) medical negligence when she placed a 407 consult request on September 18, 2017, rather than the 9th.  *Comstock*, 273 F.3d at 703.

### c.      Count 4

In Count 4, Sedore alleges that, beginning on September 18, 2017, Dr. Greiner and PA Jindal acted outside the scope of their training by failing to provide certain diagnostic testing, surgery, and treatments recommended by specialists.  (ECF No. 1, PageID.44). Again, the unrebutted record evidence is to the contrary.

Sedore's medical record indicates that no fewer than seven 407 requests were placed for specialty consultations and treatment during the ten-month period at issue.  The first was on September 18, 2017, for a neurosurgery evaluation, which was approved the next day.  That consult took place with Dr. Loganathan on October 30, 2017.  Lumbar fusion surgery was discussed, but ultimately conservative treatment was recommended, including at least one epidural steroid injection.  Pursuant to that recommendation, PA Jindal placed a 407 request for an epidural steroid injection on October 31, 2017.  That request was approved on November 2, 2017, and Sedore received the injection on December 20, 2017.

With respect to his orthopedic issues, Sedore had been approved for an orthopedic consultation before transferring to ARF.  He underwent this consultation with Dr. Ekpo on October 26, 2017.  Dr. Ekpo recommended a Psoas release procedure but indicated that his office did not perform this procedure.  On November 2, 2017, a 407 request was submitted for the Psoas release procedure; that request was deferred given the fact that medical necessity had not been demonstrated, and Dr. Ekpo's office did not perform the procedure. On November 13, 2017, PA Jindal met with Sedore to discuss an alternative treatment plan. The plan was to resubmit a 407 request for an orthopedic consult for the procedure and continue prescribed medications; Sedore was advised to kite with any health concerns.  PA Jindal submitted a new 407 request the same day, and it was approved two days later.

On January 24, 2018, PA Jindal submitted a 407 request for a PMC re-evaluation, noting that Sedore was having difficulty sleeping at night due to his pain, had signs of a Psoas impingement, was scheduled for a Psoas release procedure, had been diagnosed with nerve length dependent sensory motor axonal peripheral polyneuropathy, and an epidural steroid injection administered in December 2017 had not provided relief.  This request apparently was granted, as the PMC provided a recommendation on January 31, 2018. Finally, on April 4 and 6, 2018, PA Jindal submitted 407 requests for a diagnostic hip injection and consultation with a PMR physician.  These requests too were approved.

In sum, a review of Sedore's medical records reveals no evidence that he was ever denied or delayed medically necessary treatment, testing, or surgery.  Dr. Greiner and PA Jindal followed each specialist's recommendations precisely, aside from Dr. Ekpo's proposed Psoas release procedure, which was not performed either in his office or at

Michigan Medicine, and which ultimately was not recommended in the follow-up consultation with NP Davis on April 3, 2018.  Sedore's claim that he was denied certain testing and surgery amounts to nothing more than his disagreement between his belief that he needed surgical intervention and the recommendations of numerous healthcare professionals that he did not.  But such disagreements with medical judgment are not enough to prove a constitutional violation.  *See Westlake*, 537 F.2d at 860 n. 5 ("Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.").  As such, summary judgment is appropriate as to Count 4.

### d.    Count 8

In Count 8 of his complaint, Sedore alleges that, on October 25, 2017, he had an appointment with Dr. Greiner, during which Dr. Greiner was unprofessional and refused to seek referrals for medical testing, surgery, or pain management and refused to assess his severe pain and need for assistive devices.  The undisputed evidence is to the contrary.

Sedore's medical records reveal that, on the date in question, Dr. Greiner evaluated Sedore's need for pain medication, noting that he had tried Neurontin and Cymbalta without improvement, and that, prior to his 2009 car accident, he was taking Norco, fentanyl, Ultram, and Dilaudid for chronic low back pain.  (ECF No. 97-1, PageID.1540-41).  Dr. Greiner further noted that Sedore had turned in Motrin and Tylenol because they were not helping his pain.  Importantly, in considering Sedore's request for additional pain medication, Dr. Greiner noted that Sedore's case had gone before the PMC – whose

function it is to evaluate complaints of pain and prescribe necessary medication – on both

May 9, 2017, and June 20, 2017, and that the PMC had recently determined that there was

no need for non-formulary medicine.  Dr. Greiner indicated that Sedore had appointments

scheduled with orthopedic and neurosurgery specialists in the coming days, stating that she

would "defer to [the] PMC and these specialist[s] for guidance on pain management." (*Id.*).

It is clear, then, that on the date in question, Dr. Greiner evaluated, based on the

record evidence before her, Sedore's complaints of pain and need for non-formulary

medicine, and made a decision consistent with that of the pain specialists.  While Sedore

may disagree with that evaluation and decision, such disagreement does not give rise to a

constitutional violation, and summary judgment as to this claim is warranted.  *See*

*Westlake*, 537 F.2d at 860 n. 5.[10]

e.    *Count 16*

In Count 16 of his complaint, Sedore alleges that PA Jindal changed his inhaler

prescription so that he could get a refill only once every three months, rather than every

month, in order to save money for Corizon.  Sedore further alleges that he was forced to

go two months without his inhaler and experienced breathing problems as a result.

---

[10] The record is equally devoid of evidence supporting Sedore's allegation that Dr. Greiner refused to assess his need for assistive devices on October 25, 2017.  Indeed, Sedore was evaluated repeatedly for complaints that he required assistive living devices, and the record reveals that he was provided *numerous* accommodations that were medically indicated and had only *two* accommodations removed – one of two extra cotton blankets and a room aide – when there was not a medical necessity.  Sedore's broad assertions equate to a mere disagreement between the accommodations he desired and the accommodations Dr. Greiner and PA Jindal deemed necessary in their medical judgment.  Again, this type of disagreement is not enough to prove a constitutional violation.  *See Westlake*, 537 F.2d at 860 n. 5.

Sedore's claim in this respect is belied by the medical evidence.

Upon transfer to ARF, Sedore had orders for one inhaler puff every four to six hours as needed for shortness of breath.  (ECF No. 97-1, PageID.1496).  On January 3, 2018, PA Jindal conducted a chart review, during which she renewed all of Sedore's medications. The only change was to Sedore's inhaler orders: he still was to take one puff every four to six hours as needed for shortness of breath, but the order stated that he should kite for refills and there was a limit of two cannisters every six months.  (*Id.*, PageID.1604).

On February 10, 2018, Sedore kited to complain about the "inhaler limit."  Sedore claimed he would have problems "every minute of every day" without an inhaler, and that he had received one inhaler every month since December 2016.  In response, a nurse instructed Sedore to have the unit officer contact healthcare if he experienced respiratory difficulty, so he could be evaluated.  That way, a provider could determine the efficacy of one canister per three-month refills of the inhaler.  Sedore kited again, complaining about his inhaler orders on March 12, 2018.  RN Campbell told Sedore that he would receive the inhalers as the medical provider prescribed them, and that his providers would prescribe medication that met his needs.  On March 14, 2018, Sedore underwent a respiratory assessment: he was not in any distress; his lungs were clear; and his lung function was not diminished.  This is the last mention of Sedore's complaints about his inhaler prescription in the record, and there is no evidence that he was ever without an inhaler.[11]

---

[11] While the Court's analysis focuses on the subjective component of Sedore's inhaler claim, the claim also fails the objective component.  In *Phillips v. Tangilag*, 14 F.4th 524, 534-36 (6th Cir. 2021), the Sixth Circuit recently explained:

> To prove [an] objectively serious harm in the health context, prisoners must

In short, there is simply no evidence that PA Jindal was deliberately indifferent regarding Sedore's inhalers. The record establishes that PA Jindal considered the instructions for Sedore's inhaler prescription, ensured he had an adequate supply of inhalers, and evaluated his respiratory issues to confirm the treatment's adequacy. (ECF No. 97-3, PageID.1724). Sedore's claim amounts to a mere disagreement between his desire for one inhaler per month and PA Jindal's medical judgment that a different frequency was sufficient. Such a dispute does not give rise to a constitutional violation, *see Westlake*, 537 F.2d at 860 n. 5, and summary judgment is appropriate as to this claim.

### f.   Count 18

In Count 18, Sedore alleges that he could not use his CPAP machine because he tossed and turned all night due to pain in his back, hips, legs, and knees. As set forth above, it was noted in October 2017 that Sedore was refusing to wear his CPAP at night. (ECF No. 97-1, PageID.1538). Sedore was educated on the importance of wearing the CPAP machine, which could help with his inflammation and pain. Nevertheless, March 2018 notes indicate that Sedore was not using his CPAP machine. (*Id.*, PageID.1631).

---

first establish that they have "serious medical needs." They can do so, for example, by showing that a doctor has diagnosed a condition as requiring treatment or that the prisoner has an obvious problem that any layperson would agree necessitates care. A serious medical need alone can satisfy this objective element if doctors effectively provide no care for it. More frequently, doctors provide some care and prisoners challenge their treatment choices as inadequate. To establish the objective element in this common situation, prisoners must show more. Objectively speaking, this care qualifies as "cruel and unusual" only if it is "so grossly incompetent" or so grossly "inadequate" as to "shock the conscience" or "be intolerable to fundamental fairness."

Because the record shows that Sedore's inhaler prescription was sufficient to render his lungs fully functional, the care provided cannot "shock the conscience."

Although Sedore's refusal to wear the CPAP machine is documented in the record, there is no medical evidence that his failure to comply with this treatment recommendation was due to chronic pain. Sedore has not shown how his refusal to wear the CPAP machine – which he was told could help his underlying conditions – can support a deliberate indifference claim against the Corizon Defendants. This claim too fails as a matter of law.[12]

### g.    Count 17

In Count 17, Sedore alleges that, in February 2018, the PMC – of which Dr. Blessman is a member[13] – was deliberately indifferent to his serious medical needs when it recommended Cymbalta for his chronic pain, even though Sedore's MDOC medical records show that when he took this medication less than one year earlier, he lost a significant amount of weight very quickly. (ECF No. 1, PageID.48). Specifically, in Grievance No. ARF-18-02-0477-28A ("Grievance 0477"),[14] Sedore alleged:

---

[12] Of the remaining claims that have not yet been addressed, Counts 9, 10, and 15 involve the same facts as the claims analyzed above. In Count 9, Sedore alleges that, on November 13, 2017, he had an appointment with PA Jindal, during which he asked her to re-submit paperwork to the PMC. Sedore's complaints regarding the PMC are detailed in the discussion of Count 8 above. In Count 10, Sedore alleges that, at a November 16, 2017, appointment, Dr. Greiner refused to address his need for assistive devices and canceled his accommodations for a room aide and one of two extra cotton blankets. These allegations were discussed in the context of both Counts 4 and 8. And, in Count 15, Sedore alleges that, on January 22, 2018, he questioned PA Jindal about why there was a delay in receiving the hip surgery that had been recommended, and she refused to discuss the issue. Sedore's history of specialist recommendations was discussed extensively in relation to Count 4, but it bears emphasizing that *not a single specialist who evaluated Sedore recommended hip surgery*. Thus, Sedore has failed to raise a material question of fact as to any of these claims.

[13] Although Sedore also mentions PA Jindal and Dr. Greiner in Count 17, the evidence makes clear that it was the PMC – of which Dr. Blessman was a member – that made the decisions at issue regarding prescription pain medication. Thus, Count 17 does not properly state a claim against any of the Corizon Defendants. *See Rizzo v. Goode*, 423 U.S. 362, 377 (1976); *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984) (no § 1983 liability absent the defendant's personal involvement in the alleged unconstitutional activity).

[14] In his motion for partial summary judgment on the basis of exhaustion, Blessman argues that

> I saw P.A. Rosilyn Jindal today (2/13/18).  She told me that the
> M.D.O.C. Pain Committee recommendation to treat my acute and
> chronic pain issues was as follows:  Cymbalta!  I told her that I refused
> to take that medication.  I took it up at [LMF], within the last year.
> That it did not alleviate my pain one bit then.  That [the] physician
> assistant at LMF took me off it because of the side-effects (weight
> loss).  Why would the pain committee recommend a medication that
> they know was 100% ineffective to treat my pain less than 1 year ago?
> Plus the risk of the side-effects?  This is "Deliberate indifference" to
> my serious medical needs.  I suffer 24/7 in agonizing pain, yet they
> refuse to give me adequate pain management….

(ECF No. 78-1, PageID.1255) (emphasis in original).  Sedore asserts that the significant

weight loss he suffered while on Cymbalta is documented in his medical records, which

Dr. Blessman and the PMC could (and should) have accessed when making treatment

recommendations.[15]  (ECF No. 102, PageID.2064).

---

Sedore did not properly exhaust his administrative remedies against him.  There are three
grievances in which Sedore named the "M.D.O.C. Pain Committee" (of which Dr. Blessman was
a member) and/or "M.D.O.C. Pain Committee (Jane/John Doe)" (who later was identified as Dr.
Blessman).  These include Grievance Nos. ARF-18-01-0114-28A ("Grievance 0114"), ARF-18-
01-0256-28B ("Grievance 0256"), and Grievance 0477.  (ECF No. 78, PageID.1130).  Sedore
concedes that Grievance 0114 raises "absolutely no complaint" against Dr. Blessman and that
Grievance 0256 was not fully exhausted.  (ECF No. 82, PageID.1358-61; *see also* ECF Nos. 56,
67 (finding these grievances were not properly exhausted)).  With respect to Grievance 0477,
however, Dr. Blessman does not argue that Sedore failed to exhaust his administrative remedies,
and, indeed, the Court has previously reached the opposite conclusion.  (ECF No. 78,
PageID.1133).  Thus, **IT IS RECOMMENDED** that Dr. Blessman's Motion for Partial Summary
Judgment be **GRANTED IN PART** and **DENIED IN PART** as set forth above.  The Court will
consider the merits of the claims raised in Grievance 0477.

[15] Dr. Blessman points to Sedore's allegations that the PMC could not determine an appropriate
course of pain management because his medical records were "at most 25% accurate" and he was
never examined by a PMC member.  (ECF No. 1, PageID.27).  According to Dr. Blessman, the
PMC could not have disregarded an excessive risk to inmate health or safety – thus satisfying the
subjective prong of the deliberate indifference test – when "it did not have accurate medical records
and had never examined Plaintiff."  (ECF No. 98, PageID.1746).  This argument fails at summary
judgment, though, as it at most raises a material question of fact about which aspects of Sedore's
medical records were accurate.  This is especially true given Sedore's assertion that Dr. Blessman
was aware that Cymbalta was ineffective for him and caused him serious side effects.  It also begs
the question of whether Dr. Blessman engaged in deliberate indifference by not examining Sedore.

In his motion for summary judgment, Dr. Blessman asserts that Sedore's claim against him fails because it is "nothing more than a disagreement with the pain medication recommended."[16] (ECF No. 98, PageID.1730). In support of this argument, Dr. Blessman points to Sedore's admissions that, as a member of the PMC, Dr. Blessman "considered the plaintiff's medical conditions, assessed his treatment needs, provided recommendations for medical care to address those conditions, and that he received medical care for his ailments." (*Id.*, PageID.1729) (citing ECF No. 98-1, PageID.1751-52). According to Dr. Blessman, the PMC recommended Cymbalta for Sedore's chronic pain, but he refused to take it, believing that a different medication would be more appropriate.

As set forth above, courts distinguish between "cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Alspaugh*, 643 F.3d at 169 (6th Cir. 2011). "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake*, 537 F.2d at 860 n. 5. Dr. Blessman argues that, here, where Sedore merely disagrees with the PMC's recommendation that he take Cymbalta for chronic pain, rather than "a drug of [his]

---

[16] Dr. Blessman also asserts that he is an independent contractor of the MDOC, that "his contract did not begin until December 18, 2017," and that "he was not on the PMC when the decision to prescribe Cymbalta was made[.]" (ECF No. 98, PageID.1729). These factual assertions are not supported by an affidavit or other admissible evidence, however. And, even if it is true that Dr. Blessman's contract with the MDOC did not begin until December 2017, Sedore alleges that the decision at issue was made in January 2018. Thus, it would appear that Dr. Blessman was on the PMC during the relevant time period. Regardless, Dr. Blessman appears to recognize that Sedore's claims against him are proper, conceding that Sedore "claims his injuries are ongoing." (*Id.*).

choice," such disagreement does not rise to the level of a federal constitutional claim.  (ECF No. 98, PageID.1742).  While Dr. Blessman's argument accurately cites the general rule, an exception applies here, which counsels against granting his summary judgment motion.

In *Darrah v. Krisher*, 865 F.3d 361 (6th Cir. 2017), the Sixth Circuit considered a similar case in which the prisoner plaintiff asserted a claim for deliberate indifference related to the medical treatment he received while incarcerated.  In *Darrah*, the plaintiff suffered from Palmo-Plantar-Hyper Keratoderma ("HPK"), a severe form of psoriasis that causes debilitating pain from large and deep fissures that form on the bottom of the feet. At one correctional facility, dermatologists examined Darrah's HPK and noted that it had been treated successfully with Soriatane and that multiple other treatments had proved ineffective.  As a result, Soriatane, a non-formulary drug, was prescribed with good results, and Darrah's medical records indicated that his HPK was "much improved" while taking that medication.  Subsequently, however, Darrah was transferred and no longer received Soriatane; rather, Methotrexate was prescribed and continued for months, at increasing dosages, despite the fact that Darrah's HPK worsened significantly.

Darrah filed suit, alleging that the medical providers were deliberately indifferent to his serious medical needs when they insisted on prescribing and continuing Methotrexate, despite knowing that Soriatane was the only drug that effectively treated his HPK.  He argued that Methotrexate "was so ineffective in treating his HPK that it was essentially the equivalent of no treatment at all."  *Id.* at 370.  In reversing the district court's grant of summary judgment, the Sixth Circuit held that "whether it was reasonable to continue to keep him on a drug that had proven ineffective and whether that course of

treatment constituted deliberate indifference is a question best suited for a jury." *Id.*

*Darrah* is analogous to the case at hand.  Here, viewing the facts in the light most favorable to Sedore, a genuine issue of material fact exists as to whether Dr. Blessman's January 2018 decision to prescribe only Cymbalta for Sedore's chronic pain – despite knowing that it had not eased his pain in the past and had caused dramatic weight loss – constituted deliberate indifference to his serious medical needs.  Sedore's medical records substantiate his allegations that he lost 70 pounds between January and August 2017; that he was taking Cymbalta during at least part of that period of time; and that he advised medical providers at ARF both that Cymbalta did not relieve his symptoms and that he believed it contributed to his dramatic weight loss (ECF No. 25, PageID.312-14; ECF No. 97-1, PageID.1540, 1626).  If indeed Dr. Blessman and the PMC were aware of Cymbalta's ineffectiveness for Sedore and the risks it posed to his health, yet repeatedly prescribed only this pain medication, the question of whether such actions constitute deliberate indifference should be resolved by a jury.  *Darrah*, 865 F.3d at 370.  Thus, to the extent Dr. Blessman moves for summary judgment as to this claim, his motion should be denied.

### 3.    *Sedore's* Monell *Claims Against Corizon*

In his complaint, Sedore pleads *Monell* claims against Corizon in five remaining counts: Count 3, pertaining to the alleged delay in sending inmates for neurosurgery consultations; Count 4, pertaining to timely follow-through on the recommendations of specialists; Count 8, pertaining to the assessment for assistive living devices; Count 16, pertaining to the alleged implementation of cost-saving measures; and Count 18, pertaining to Sedore's inability to use his CPAP machine.  (ECF No. 1).  In their summary judgment

motion, the Corizon Defendants argue that Sedore's *Monell* claims fail as a matter of law. (ECF No. 97, PageID.1473-74).  The Court agrees.

A private entity employed by the state to provide medical services to prison inmates (such as Corizon) may be sued under § 1983 for constitutional violations.  *See West v. Atkins*, 487 U.S. 42, 54 (1988).  However, such an entity may not be held vicariously liable for the constitutional violations of its agents on the basis of *respondeat superior*.  *See Jones v. Prison Health Servs.*, No. 11-12134, 2011 WL 7630364, at *2 (E.D. Mich. Dec. 14, 2011) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)).  Rather, "[a] plaintiff that sues a private or public corporation for constitutional violations under § 1983 must establish that a policy or custom caused the alleged injury.  The Sixth Circuit has specifically held that like a municipal corporation, a private corporation's liability must also be premised on some policy that caused a deprivation of [a prisoner's] Eighth Amendment rights."  *Maldonadodeher v. Corizon Med. Servs., Inc.*, No. 2:16-cv-21, 2016 WL 6208705, at *2 (W.D. Mich. Aug. 11, 2016) (internal citations and quotations omitted).  In other words, to prevail on his *Monell* claims, Sedore must show that Corizon had a policy, custom, or practice that resulted in a violation of his constitutional rights, i.e., that there was an "affirmative link between the policy and the particular constitutional violation."  *See Jones*, 2011 WL 7630364, at *2 (internal quotations omitted).  Viewed against these standards, it is clear that Sedore's *Monell* claims fail.

First, Sedore at most claims that *Corizon* violated his Eighth Amendment rights because *certain of its employees* delayed approval of the surgeries he claims were recommended, and instead provided him with more conservative methods of treatment.

But again, the law is clear that Corizon cannot be held liable under § 1983 merely because its employees engaged in alleged wrongdoing. *Id*.

Second, Sedore failed to present any *evidence* showing that the Corizon employees who made the challenged medical decisions did so pursuant to a policy or custom adopted by Corizon. Rather, in each of the counts directed at Corizon, Sedore merely lists Corizon as one of the "people involved," without alleging the existence of any specific policy, practice, or procedure, or demonstrating a pattern of repeated conduct that would suggest that such a policy, practice, or procedure exists. Similarly, in his reply brief, Sedore repeats his broad allegations that Corizon has "policies, procedures, practices in place to ration, limit, delay, deny necessary medical treatment," but nowhere does he specifically identify any of these policies, procedures, or practices, let alone present any evidence as to their existence. (ECF No. 100, PageID.1756). Thus, he fails to meet his burden. *See, e.g., Maldonadodeher*, 2016 WL 6208705, at *2 ("Plaintiff's complaint fails to set forth any policy on the behalf of Corizon that caused the alleged deprivation of his rights.… Corizon is entitled to dismissal ….") (internal citations and quotations omitted).

Nor can Sedore satisfy his burden simply by pointing to his own situation. In *Ragland v. Corizon Med. Providers, Inc.*, No. 1:19-cv-523, 2021 WL 4975843, at *3-5 (W.D. Mich. Sept. 30, 2021), the court considered a similar situation, finding that the plaintiff had failed to establish the essential requirement of a *Monell* claim, i.e., that a Corizon policy or custom caused his injury. In *Ragland*, the plaintiff argued that Corizon's failure to send him for his six-week post-operative neurology appointment, which had been recommended by the doctor who performed his lumbar decompression and fusion surgery,

violated his Eighth Amendment right to adequate medical care.  The plaintiff claimed that

he repeatedly put Corizon on notice that he had not been sent for his neurology follow-up,

but Corizon failed to approve or schedule the appointment.  In addition, the plaintiff argued

that Corizon interfered with his surgeon's orders for Ultram without a clear medical reason.

In granting summary judgment for Corizon on the plaintiff's *Monell* claim, the Court noted

that the plaintiff had offered no evidence that a Corizon policy or custom caused the alleged

constitutional deprivation.  *Id.* at *4.  The plaintiff had not shown that Corizon was aware

of prior unconstitutional actions by its employees and failed to take corrective measures.

And, finally, the Court noted that the plaintiff's claims that:

> … his rights were violated in this particular instance is insufficient to
> meet his burden of establishing a policy, practice, or custom.  A
> plaintiff may not rely upon an isolated instance to establish a policy
> or custom.  Instead, he must show a pattern or repeated evidence of
> such conduct.

*Id.* (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 432-33 (6th Cir. 2005)).

The *Ragland* case is analogous to Sedore's.  In short, he fails to present evidence

demonstrating the existence of an unconstitutional Corizon policy, practice, or procedure

that the medical providers were following when they engaged in the allegedly wrongful

conduct, and Sedore's complaints about the providers' responsiveness to his own requests

cannot fill that void.  Corizon is thus entitled to summary judgment.

## III.    CONCLUSION

For the foregoing reasons, **IT IS RECOMMENDED** that: (1) the Corizon

Defendants' Motion for Summary Judgment **(ECF No. 97)** be **GRANTED**; (2) Dr.

Blessman's Motion for Partial Summary Judgment **(ECF No. 78)** be **GRANTED IN**

**PART AND DENIED IN PART**; and (3) Dr. Blessman's substantive Motion for Summary Judgment **(ECF No. 98)** be **DENIED**.  Should this recommendation be adopted, the only surviving claim will be Sedore's Eighth Amendment claim against Dr. Blessman.


Dated: August 4, 2022                                 s/David R. Grand
Ann Arbor, Michigan                               DAVID R. GRAND
                                                              United States Magistrate Judge


## NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.  A party may respond to another party's objections within 14 days after being served with a copy.  *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1).  Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 4, 2022.

s/Eddrey O. Butts      
EDDREY O. BUTTS
Case Manager
